IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KRISTY R. BIGBY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-14-540-SPS |
| | ) |
| CAROLYN W. COLVIN, | ) |
| ACTING Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

The claimant Kristy R. Bigby requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby AFFIRMED.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security

regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Sec'y of Health & Human Svcs.*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts

---

[1] Step one requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. *Id*. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity, or if her impairment is not medically severe, disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant suffers from a listed impairment (or impairments "medically equivalent" to one), she is determined to be disabled without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must establish that she lacks the residual functional capacity (RFC) to return to her past relevant work. The burden then shifts to the Commissioner to establish at step five that there is work existing in significant numbers in the national economy that the claimant can perform, taking into account her age, education, work experience and RFC. Disability benefits are denied if the Commissioner shows that the claimant's impairment does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *See also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was born on December 23, 1967, and was forty-five years old at the time of the administrative hearing (Tr. 123, 232, 239). She has a high school equivalent education, some college, and has worked as a library clerk and file clerk (Tr. 124-25, 155, 312). The claimant alleges she has been unable to work since September 15, 2009, due to long QT syndrome, depression, and problems with her shoulder, neck, left arm, and back (Tr. 311).

**Procedural History**

On October 28, 2011, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. Her applications were denied. ALJ Gene M. Kelly conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated June 18, 2013 (Tr. 101-12). The Appeals Council denied review, so the ALJ's opinion represents the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except she could occasionally reach

over shoulder level with her left upper extremity, needed to alter her position from time to time, and must avoid rough uneven surfaces, unprotected heights, fast and dangerous machinery, sunlight (must have an inside job), and fine vision (Tr. 105). Additionally, her work environment must be low noise and low light (general commercial environments permitted) and neither cold nor damp (Tr. 105-06). The ALJ further found the claimant had a slight limitation with her ability to finger, feel, and grip, to twist and nod her head, and to have contact with supervisors, co-workers, and the public (Tr. 105-06). The ALJ concluded that although the claimant could not return to her past relevant work, she was nevertheless not disabled because there was other work she could perform in the national and regional economies, *i. e.*, mail room clerk, assembler, marker, clerical mailer, bonder assembler, and trimmer (Tr. 111).

## Review

The claimant contends that the ALJ erred by failing to: (i) perform a proper determination at steps 4 and 5, (ii) properly evaluate the medical and nonmedical source evidence, and (iii) perform a proper credibility determination. The Court finds these contentions unpersuasive.

The ALJ determined that the claimant had the severe impairments of depression, anxiety, headaches, and problems with shoulders, neck, arms, back, heart, and skin (Tr. 103). The relevant medical evidence reveals that the claimant underwent left shoulder rotator cuff surgery on September 10, 2009 (Tr. 349). Dr. Grooms noted improvement at each of her follow-up appointments, and by January 2010 he found she had good range of motion (Tr. 380-83).

Dr. Quadeer performed a physical consultative examination of the claimant on December 17, 2009 (Tr. 355-62). He found the claimant had pain and decreased range of motion in her left shoulder, slightly decreased range of motion in her lumbar-sacral spine without tenderness, and full range of motion without tenderness in her cervical spine and thoracic-lumbar spine (Tr. 357-61). Additionally, Dr. Quadeer noted the claimant had a safe and stable gait with appropriate speed (Tr. 357).

After reporting numbness in her left fingers on January 25, 2010, Dr. Grooms referred the claimant for a nerve conduction study, the results of which were normal (Tr. 379-80). The claimant continued to report numbness and neck pain, and Dr. Grooms referred her for a cervical MRI in March 2010, which revealed degenerative disc disease at C4-C5 and C5-C6 with some encroachment on the left neuro foramina (Tr. 378). The claimant then received a cervical epidural steroid injection that she reported improved her neck pain by "80%," but not her shoulder pain (Tr. 377-78). Dr. Grooms administered a steroid injection into her shoulder on June 21, 2010, and on August 16, 2010, which improved both her neck and shoulder pain (Tr. 376-77). The claimant participated in physical therapy from August 25, 2010, until October 1, 2010 (Tr. 415-24).

On October 13, 2011, the claimant established care with Dr. Cameron at Oklahoma Heart Institute (Tr. 440-42). The claimant reported a history of syncope triggered by standing, warm/humid environments, emotional distress, and pain, and indicated a previous electrocardiogram ("ECG") demonstrated a prolonged QT interval (Tr. 440). Dr. Cameron performed an ECG that day which did not demonstrate long QT syndrome (Tr. 442). He stated the claimant's symptoms were most consistent with

vasovagal syncope, but did not rule out long QT syndrome (Tr. 442). The claimant's ECG was also normal at her second appointment on February 14, 2013, and Dr. Cameron recommended genetic testing for long QT syndrome (Tr. 553-55).

The claimant regularly sought treatment at Three Rivers Health Center between January 14, 2011, and May 23, 2012 (Tr. 478-502, 518-49). Her diagnoses related to her disability claim included neck muscle strain, left chest wall pain, prolonged mourning, long QT syndrome, degenerative disc disease, prurigo nodularis, chronic neck pain, vasovagal syncope, onychomycosis right second toe, syncope, and hyperlipidemia. She reported left shoulder pain and/or neck pain on six occasions from January 2011 to February 2012, and she was largely managed on medication (Tr. 401, 410, 489-90, 493).

On June 8, 2012, state reviewing physician Dr. Rymer found the claimant could perform the full range of light work (Tr. 466-74, 504).

On September 7, 2012, the claimant presented to Dr. Weaver with pain in her cervical spine and left shoulder that radiated into her left shoulder blade and thoracic spine (Tr. 508-10). Dr. Weaver noted tenderness on the left from C3-C7, palpable trigger points in her left trapezius and rhomboid muscles, but no muscle spasms or instability (Tr. 509). He diagnosed the claimant with cervical spondylosis, thoracic spondylosis, and herniated disc without myelopathy (Tr. 509). An October 2, 2012, MRI of the claimant's cervical spine revealed cervical spondylosis, but no canal stenosis, cord compression, or significant neural foraminal narrowing (Tr. 505). An MRI of the claimant's thoracic spine performed the same day was normal (Tr. 506). Dr. Weaver referred the claimant for physical therapy in October 2012, which she initiated on

February 11, 2013, and continued until March 14, 2013 (Tr. 558-65, 572). At a follow-up appointment with Dr. Weaver on April 29, 2013, the claimant reported no improvement with physical therapy, but that her muscle relaxant was effective (Tr. 572).

At the administrative hearing, the claimant testified, *inter alia*, that she was unable to work due to neck pain, lower back pain, toe fungus, a heart condition, high blood pressure, depression, anxiety, vision problems, and pain in her left shoulder, arm, hand, and hip (Tr. 128-29). She stated she gets an "asleep feeling" in her left hand, was tested for carpal tunnel syndrome (but not diagnosed), and that she normally wears a brace (Tr. 132, 139). She testified when she experiences headaches, she gets relief in a half day by lying down in a dark, quiet room (Tr. 132-33). As to her skin problems, the claimant testified that she is allergic to the sun and has open sores on any exposed skin (Tr. 134-35). She further testified that her heart condition could cause her death at any moment, which in turn causes anxiety and depression (Tr. 137). As to her left shoulder, she stated she could not lift her arm due weakness, decreased movement, and pain (Tr. 140-41). She testified her back problems began in 1997, and although surgery was discussed "at one time," she refused because of the "repercussions." (Tr. 143). As to her specific limitations, the claimant testified she could change an overhead lightbulb with pain, drive using her mirrors only, bend, squat, slowly climb a flight of stairs, lift a gallon of milk, sit for 20-30 minutes before needing to stand up, stand for 10-15 minutes before needing to sit down, and walk for 2-3 blocks before needing to rest (Tr. 140-45).

In his written opinion, the ALJ summarized the medical evidence, including the claimant's hearing testimony. At step two, he discussed the claimant's impairments,

explaining those he deemed severe (Tr. 103). At step four, he noted the claimant's testimony, as well as the medical evidence related to the claimant's severe impairments (Tr. 105-10). The ALJ then found the claimant not fully credible. As to the opinions in the record, the ALJ gave significant weight to Dr. Weaver's records, substantial weight to Dr. Cameron's records, and considerable weight to the records from Three Rivers Health Center, Dr. Turnock's consultative examination, and Dr. Quadeer's consultative examination (Tr. 110). The ALJ stated he concurred with Dr. Rymen's opinion that the claimant could perform light work, but added several limitations to the claimant's RFC.

The claimant first contends that the ALJ failed to properly evaluate the medical source evidence. Specifically, she asserts that the ALJ did not follow the proper framework for determining the weight assigned to a treating source's opinion, thus he did not explain his reasoning for the weight he assigned to the medical sources. *See Krauser v. Astrue,* 638 F.3d 1324, 1330 (10th Cir. 2011) (discussing two-step analytical framework regarding treating medical source opinions). The Court notes that the ALJ properly considered and adopted every medical opinion in the record regarding the claimant's diagnoses. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Further, the claimant fails to point to any medical source opinion with work-related limitations or exertional restrictions stemming from her impairments that the ALJ failed to adopt. *See, e. g., Watkins v. Barnhart,* 350 F.3d 1297, 1299 (10th Cir. 2003) (assessing treating medical source opinion regarding the nature and severity of an impairment that rendered the claimant "unable to work an eight-hour day doing anything sitting or standing"). *See also Krauser,* 638 F.3d at 1330 (assessing treating medical source opinion regarding

-8-

exertional restrictions). The ALJ adopted any limitations found by her medical sources, *added more restrictive limitations* of his own, *and still concluded* that the claimant could perform light work. Given that the ALJ did not reject any impairments or limitations found by the claimant's medical sources, he did not err in his analysis of them. *Cf. Watkins,* 350 F.3d at 1300-01 (reversing district court judgment where the ALJ failed to perform an analysis regarding the weight to assign to a treating medical source's opinion that the claimant could not do anything sitting or standing in an eight-hour workday).

The claimant next contends that the ALJ failed to properly consider the Third Party Function Report submitted by her husband. In this case, the ALJ discussed the Third Party Function Report at step three by noting the husband's statements that the claimant: (i) cannot do household chores due to her prior injuries, (ii) takes care of her personal needs, (iii) cooks simple meals, (iv) does light cleaning and small loads of laundry three times per week, (v) does not leave the house alone because she might pass out, (vi) has a license, but does not drive, (vii) goes to the store three times per month, and (viii) is able to handle finances, but the ALJ did not mention the husband's report at step four. "[I]n addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton*, 79 F.3d at 1009. However, specific written findings about each lay witness's credibility are not necessarily required, particularly where the ALJ's written decision reflects that he considered the evidence. *See Adams v. Chater,* 93 F.3d 712, 715 (10th Cir. 1996). A specific credibility determination is also not required for lay witness statements that are cumulative of other

-9-

evidence that was discussed. *See Brescia v. Astrue,* 287 Fed. Appx. 626, 630 (10th Cir. 2008) (finding no reversible error where the ALJ did not discuss lay witness testimony that was "largely cumulative" of the claimant's testimony and written statements). *See also Best-Willie v. Colvin,* 514 Fed. Appx. 728, 736 (10th Cir. 2013) (finding no reversible error where the ALJ did not discuss a lay witness statement when "the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims."). Here, the ALJ's decision reflects that he did consider the Third Party Function Report because he summarized it at step three. Additionally, the report is largely cumulative of the claimant's own statements, which the ALJ properly found were not completely credible as discussed below (Tr. 104). The claimant also asserts in her brief that her husband's report supports her credibility, which is, in essence, an agreement that her husband's statements are largely cumulative of her own. *See Brescia*, 287 Fed. Appx. at 630.

The claimant next contends that the ALJ failed to perform a proper credibility determination. A credibility determination is entitled to deference unless there is some indication that the ALJ misread the medical evidence as a whole. *Casias,* 933 F.2d at 801. But credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (citation omitted). An ALJ's credibility analysis "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'" *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004), *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

The ALJ found "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible," and that the symptoms and limitations she described throughout the record were generally inconsistent and unpersuasive (Tr. 107, 110). In making these findings, the ALJ set forth the applicable credibility analysis, summarized the evidence he relied on, and discussed numerous reasons for disbelieving the full extent of the claimant's allegations of disabling limitations, including: (i) a lapse in treatment,[2] (ii) noncompliance with physical therapy, (iii) her daily activities, and (iv) discrepancies between her allegations of pain and the objective evidence (referring specifically to treatment notes from Dr. Grooms and Dr. Weaver) (Tr. 115-118). Thus, the ALJ linked his credibility determination to the evidence as required by *Kepler*, and provided specific reasons for the determination in accordance with *Hardman*. There is no indication here that the ALJ misread the claimant's medical evidence taken as a whole, and his determination of the claimant's credibility is therefore entitled to deference. *See Casias*, 933 F.2d at 801.

The claimant's remaining arguments all relate to the ALJ's step five findings. At step five, the Commissioner has the burden to show that, given a claimant's background and RFC, the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). *See also Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998) (citation omitted). The ALJ can satisfy this burden with a vocational expert's ("VE") testimony. 20 C.F.R. §§ 404.1566(e), 416.966(e). To

---

[2] The ALJ stated the lapse in treatment occurred at Three Rivers Health Center, however, the record shows the lapse occurred at Oklahoma Heart Institute.

constitute "substantial evidence," the ALJ must present the VE with all of a claimant's physical and mental impairments before the VE determines whether sufficient jobs exist in the national economy. *Hargis v. Sullivan*, 945 F.2d 1482, 1491-92 (10th Cir. 1991). The ALJ may elicit testimony through hypothetical questions that "relate with precision all of a claimant's impairments . . . ." *Id.* at 1492 (quotation omitted). When the ALJ's RFC findings are "adequately reflected in the ALJ's hypothetical inquiries to the [VE], the expert's testimony provide[s] a proper basis for adverse determination of [the] case." *Gay v. Sullivan,* 986 F.2d 1336, 1341 (10th Cir. 1993).

At the administrative hearing, the ALJ presented the following hypothetical to the VE:

> Assume we have a 45-year-old female, GED, good ability to read, to write, to use numbers. Assume further the individual has the physical capacity to do sedentary and light work; lift and carry to 20 pounds; to stand and walk six hours in eight; to sit six hours in eight, each with normal breaks. I will note the depression, the anxiety, and the panic; however, for the purposes of this hypothetical there'll be no specific functional restrictions placed. Assume further that the individual is afflicted with symptomatology from a variety of sources that produces mild to moderate chronic pain, which is of sufficient severity to be noticeable to her at all times but that nonetheless she will be able to remain attentive and responsive in a work setting, and can carry out normal work assignments satisfactorily. Assume further that the claimant takes or the individual takes medication for the relief of that symptomatology. The medication will not preclude work at the sedentary and light level as restricted. And she will remain reasonably alert to perform required functions in the job setting. And assume further while functioning at the sedentary and light level as restricted, the individual will find it necessary to alter position from time to time to relieve that symptomatology. That could include standing up or sitting down or shifting positions.

(Tr. 155-56). In response, the VE testified the hypothetical person the ALJ described could return to the claimant's past relevant work as a library clerk, a skilled, light exertion job, and file clerk, a semi-skilled, light exertion job. The ALJ then inquired regarding the availability of unskilled jobs, and the VE testified the following light exertion jobs would be available: mailroom clerk (DICOT § 209.687-026), assembler (DICOT § 706.684-022), and marker (DICOT § 920.687-126), and the following sedentary exertion jobs would be available: clerical mailer (DICOT § 209.587-010), bonder assembler (DICOT § 726.685-066), and trimmer (DICOT § 692.685-266). In his second hypothetical question, the ALJ added the following restrictions: (i) occasional climb, bend, stoop, squat, kneel, crouch, crawl, push-pull, operate foot controls, and reach over shoulder level with the left upper extremity; (ii) avoid rough, uneven surfaces, unprotected heights, fast and dangerous machinery, sunlight, and fine vision; (iii) slight limitation with finger, feel, and grip, in twist and nod of head, and in contact with public, coworkers, and supervisors; (iv) work environment must be low-noise and low-light, and neither damp nor cold; and (v) work must be simple, repetitive, and routine. The VE testified that with these additional restrictions in hypothetical two, the number of bonder assembler jobs would be reduced by half because some require soldering and some use machines, but the other unskilled jobs would remain the same. The ALJ's ultimate RFC assessment was based on the second hypothetical except that he did not limit the claimant to simple, repetitive, and routine work, or occasional climbing, bending, stooping, squatting, kneeling, crouching, crawling, pushing/pulling, and operating foot controls. When the ALJ asked the VE whether there had been any deviation from the DOT in her

testimony that needed to be explained or that required further explanation, she responded in the negative.

As an initial matter, the claimant asserts reversible error at step five because the ALJ's hypothetical question to the VE limited the claimant to occasional pushing/pulling and operation of foot controls, while the ALJ's RFC determination did not include either limitation. The claimant correctly points out that an ALJ's hypothetical question to the VE must include all of the limitations he ultimately finds in his RFC assessment. *See Hargis,* 945 F.2d at 1491, ("[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.") (quotation omitted). *See also Qualls v. Apfel,* 206 F.3d 1368, 1373 (10th Cir. 2000). However, in this case, the ALJ's hypothetical question was *more restrictive* than his RFC determination; thus, the VE's testimony about jobs which include limitations on pushing/pulling and operating foot controls do not preclude the claimant from performing them in the absence of those same limitations. *See Seever v. Barnhart,* 188 Fed. Appx. 747, 753 (10th Cir. 2006) (finding harmless error where the ALJ included a limitation in his hypothetical question to the VE that he did not include in his RFC). *See also Phillips v. Astrue,* 2010 WL 3122915, at *4 (N.D. Okla. Aug. 5, 2010) (claimant's argument that the ALJ erred because his hypothetical to the VE was more restrictive than his RFC was "frivolous."). Similarly, the claimant asserts that she cannot perform the mail room clerk job (which requires a reasoning level of 3) because she is limited to simple repetitive tasks, and that she cannot perform the assembler job because she is prohibited from being an integral member of a

team. Although the ALJ's second hypothetical to the VE included these limitations, his ultimate RFC assessment did not and the ALJ is not bound by limitations he did not ultimately adopt. *See Seever*, 188 Fed. Appx. at 753.

Second, the claimant argues that the VE's testimony was unreliable because the ALJ's hypothetical question included the limitations of "avoid fine vision" and "slight limitation with finger, feel, and grip," which are not defined in the Dictionary of Occupational Titles ("DOT"). However, the ALJ provided a detailed description of both limitations in the hypothetical he presented to the VE, which he defined as follows:

> I want to avoid fine vision. I'm not saying she can't work with her eyes, but she shouldn't be doing extensive amounts of small, tedious tasks with her eyes like pin and clip fastening, working with small, tiny nuts and bolts. Slight limitation with finger, feel, and grip, and this basically goes along with the vision. She shouldn't be doing small, tedious tasks with her hands and fingers. She could put a child's bicycle together, but she might have trouble playing with a child's erector set . . .

(Tr. 159-60). Thus, the ALJ specifically clarified the extent of the limitations he found. *See Luttrell v. Astrue,* 453 Fed. Appx. 786, 790 (10th Cir. 2011) (finding no error where ALJ described in "detailed concrete terms" what he meant by "slight limitation in the ability to finger, feel, and grip").

Third, as to the limitation of occasional reaching overhead with her left arm, the claimant asserts that because the DOT does not break down the ability to reach into directions, she is limited to occasional reaching in all directions. However, the Tenth Circuit recognized that "even a job requiring frequent reaching does not necessarily require more than occasional overhead reaching." *See Segovia v. Astrue,* 226 Fed. Appx. 801, 804 (10th Cir. 2007). Being aware of the claimant's limitations on overhead

reaching, the VE testified that the claimant could perform the jobs she identified and that her testimony did not deviate from the DOT. "In these circumstances, the VE's testimony does not conflict with the DOT . . . so much as it clarifies how their broad categories apply to this specific case." *Id.* The claimant further argues that she is limited to occasional reaching because she is limited to occasional pushing/pulling overhead, but she has provided no support for this finding and the ALJ's RFC did not include any limitations on pushing or pulling. *Qualls*, 206 F.3d at 1373 ("The ALJ propounded a hypothetical question to the VE that included all the limitations the ALJ ultimately included in his RFC assessment. Therefore, the VE's answer to that question provided a proper basis for the ALJ's disability decision.").

Finally, the claimant contends that each of the jobs identified are precluded by her RFC. The Court need not address each job and its corresponding requirements individually because even assuming *arguendo* that the claimant cannot perform the mail room clerk, assembler, marker, clerical mailer, and trimmer jobs, the claimant can perform the job of bonder assembler, as discussed below. *See, e. g., Stokes v. Astrue,* 274 Fed. Appx. 675, 684 (10th Cir. 2008) (finding any error on whether claimant could perform a job was harmless error since there were still two jobs the claimant could perform and no "reasonable factfinder could have determined that suitable jobs did not exist in significant numbers in either the region where Ms. Stokes lives or several regions of the country."). The claimant asserts that she cannot perform the bonder assembler job because the DOT indicates that it requires significant tending of things, occasional reaching, frequent handling, and frequent near vision. *See* DICOT § 726.685-066. In

this case, these arguments fail because: (i) the ALJ's RFC assessment did not include a limitation on her ability to tend to things; (ii) this job only requires occasional reaching and the ALJ limited her to occasional reaching over shoulder level with the left upper extremity; and (iii) the ALJ properly defined and accounted for the claimant's limitations on vision and handling, and the VE testified, *inter alia*, that the bonder assembler job would be reduced by 50% (to 40,000 jobs nationally and 3,000 regionally) "because some of that is very fine vision, if they're having to use soldering, and some use automatic machines." (Tr. 161-62). "At step five of the sequential analysis, an ALJ may relate the claimant's impairments to a VE and then ask the VE whether, in his opinion, there are any jobs in the national economy that the claimant can perform. This approach, which requires the VE to make his own evaluation of the mental and physical demands of various jobs and of the claimant's ability to meet those demands despite the enumerated limitations, is acceptable at step five because the scope of potential jobs is so broad." *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir. 1996).

## Conclusion

In summary, the Court finds that correct legal standards were applied, and that the decision of the Commissioner is supported by substantial evidence. The Commissioner's decision is therefore hereby AFFIRMED.

**DATED** this 30th day of March, 2016.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**